Filed 10/3/13  In re Michael R. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| In re MICHAEL R. et al., Persons Coming Under the Juvenile Court Law. | C072236 |
| BUTTE COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M. R.,<br><br>Defendant and Appellant. | (Super. Ct. Nos. J35101, J35102, J35103) |

M.R., the mother of 11-year-old Peter R., nine-year-old Matthew R., and six-year-old Michael R., appeals from orders of the Butte County Juvenile Court denying her request to return the children to her care and terminating her parental rights.

On appeal, mother contends (1) the juvenile court's order terminating her parental rights was in error because the children shared a beneficial bond with her and would suffer significant detriment if their relationships with her were severed, and (2) the

1

court's order denying her request to return the children was not supported by evidence and is thus an abuse of discretion.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Originating Circumstances*

On January 2, 2010, law enforcement responded to a report of domestic violence. Mother and the father of the children appeared to be under the influence of methamphetamine.[1]  A significant amount of methamphetamine was found on mother. The residence was filthy and had no furniture or beds for the children.  The children were not properly clothed for the cold weather and had not recently been bathed.  The youngest child had feces on his leg.  Blankets the children had been sleeping on " 'reeked of urine.' "  Very little food was in the home, food on the range and most of the refrigerated food had spoiled, and several dishes and pots were dirty.  The parents were arrested and booked into jail.

### *Original Petitions*

The Butte County Department of Employment and Social Services/Children's Services Program (Department) filed petitions alleging the children came within the juvenile court's jurisdiction in that law enforcement responded to a call of domestic violence, the parents were under the influence of methamphetamine, the parents were arrested on child endangerment and drug charges, the home's filthy conditions presented a health and safety risk, the home was in foreclosure and the parents anticipated eviction, and approximately 16 possible domestic violence incidents at the home had been reported since November 2009.  (Welf. & Inst. Code, § 300, subd. (b).)[2]

---

[1]  The father appealed from the judgment but did not file an opening brief.  His appeal has been dismissed.

[2]  Further undesignated statutory references are to the Welfare and Institutions Code.

## *Detention*

At the detention hearing on January 6, 2010, mother appeared in custody. The issue of detention was submitted and the children were ordered detained. The juvenile court authorized visits between mother and the children at the jail.

## *Jurisdiction and Disposition*

At the jurisdiction hearing on February 11, 2010, the parents submitted on the verified petition as amended and the juvenile court found the allegations were true.

The March 2010 disposition report recommended that the parents receive reunification services. The report described Peter as a "very bright and deep thinking child who is very mature for his age." Although very capable of superior academic work, he was underachieving in most areas and had been absent for nine days and tardy on 10 days of the first trimester of school. Peter was very parentified and showed great concern for his family due to his parents' drug use and the minors' detention. Peter had been " 'afraid this was going to happen' " if his parents "continued to 'use the pipe'. "

Matthew was in kindergarten, performing at grade level and excelling in many areas. He had been absent for nine days and tardy on five days of the first trimester. He was not showing any signs of emotional trauma, but the social worker thought he would benefit from working with a therapist during this stressful period of his life.

Michael was too young for school but had serious behavioral and emotional issues that could preclude him from being placed in a regular classroom. The foster parents attempted to enroll him in preschool but the parents failed to sign the necessary paperwork. The Department requested appointment of an educational surrogate. Michael's behaviors interfered with his ability to cope with his family's state of crisis. The children initially had been placed together, but Michael's behaviors and aggressiveness led to his placement in a foster home with a higher level of care. He had been placed in day care but was prohibited from returning after one day.

A maternal second cousin and her husband requested placement of the children. They had maintained visitation and were scheduled for an overnight visit with Peter and Matthew. They supported family reunification and were willing to provide permanency if reunification failed. The parents had expressed apprehension about placement with these relatives but concluded it was preferable to continued foster care. The Department planned to first place Michael with the relatives and then transition his siblings after Michael had stabilized.

Mother was referred to drug and alcohol treatment, but she failed to appear for her appointment and was not participating in treatment. She had not attended any parent support group meetings but had attended 14 12-step meetings. She had not attended any domestic violence support group meetings. Mother's drug testing history included six negative tests, one positive and diluted test for methamphetamine, one failure to test, and several failures to accept messages instructing her to test.

At the disposition hearing on March 4, 2010, the juvenile court adopted the recommended findings and orders, suspended the parents' rights to make educational decisions regarding Michael, and appointed a court appointed special advocate (CASA) as Michael's educational surrogate.

In July 2010 the therapist for Peter and Matthew recommended that the boys not visit either parent at the jail.

In August 2010 Michael's CASA recommended that he remain in his foster placement and not be moved to his brothers' placement.

That same month, the state Department of Social Services approved the maternal relatives as a permanency option for Peter and Matthew, and approved Michael's foster placement as a permanency option for him.

### Six-Month Review

The report for the six-month review recommended that mother continue in a plan of family reunification. She had struggled with her ongoing addiction issues and had

4

made minimal progress toward reunification with the children. She was jobless and homeless, and continued to test positive for methamphetamine and marijuana. When confronted with positive test results, mother would appear "wide-eyed and completely shocked," and would blame the results on something she had eaten. When she met with her social worker and substance abuse counselor in May 2010, mother was hostile and attributed her failure to attend drug treatment to her dissatisfaction with the children's placement with relatives. When her counselor told her to " 'get real,' " mother broke down in tears, admitted using methamphetamine the previous weekend, and stated she found it difficult to " 'stay clean.' " Mother agreed that she would benefit from a more intensive substance abuse program, but she failed to keep appointments for an alcohol and drug assessment.

In July 2010 mother arrived late for an interview at the probation department and claimed to have lost or misplaced paperwork for the appointment. She claimed the police report had " 'exaggerated' " the condition of the home and had lied about the physical condition of the children. Mother did not believe she needed residential treatment and preferred to serve a jail sentence.

Mother attended two out of four alcohol and drug assessment appointments, had not successfully completed substance abuse treatment, was attending a parent support group, and had attended only 14 12-step meetings in six months. After regularly failing to drug test for four to five months, mother tested clean during the month preceding preparation of the six-month review report.

Mother was scheduled to have regular visitation with the children, but she often failed to attend the visits due to continued drug use. The inconsistent visits were detrimental to the children, particularly Peter, the oldest child, who exhibited severe anxiety and distress when the parents failed to attend a visit or appeared under the influence. When the parents visited the children they demonstrated good parenting skills and abilities.

5

At the review hearing on August 26, 2010, the juvenile court ordered the parents to continue in a plan of family reunification.

### Twelve-Month Review

The report for the 12-month review recommended that mother continue in a plan of family reunification. Mother continued to struggle with substance abuse treatment. She became romantically involved with her former drug dealer. She believed she could maintain sobriety on her own despite cohabiting with him. After agreeing to enter residential treatment and failing to follow through, mother eventually completed 63 days of residential treatment and graduated from the program. She was residing in a homeless shelter until an opening was available in a sober living environment. She also was on a waiting list for a transitional living program.

The probation department randomly tested mother for drugs. Mother admitted to " 'eating baking soda and drinking large amounts of water' " to falsify her drug test results. Mother's test results were negative but her admitted behavior called the results into question.

While in utero, Michael had been exposed to methadone and possibly alcohol, in that he exhibited defined characteristics consistent with fetal alcohol syndrome.

Peter and Matthew participated in weekly psychotherapy. Their therapist reported that the children were " 'showing continued, improving progress in their overall feelings of being safe and cared for in their current placement and have developed healthy attachments.' " Michael had attended several counseling sessions, but the clinician and foster mother did not believe they were beneficial and his sessions were discontinued.

The children visited mother regularly, but arranging visits was difficult while mother was in residential treatment.

The 12-month review hearing was conducted on February 10, 2011, and a contested hearing was requested. At the pretrial conference for the contested hearing, the matter was submitted by counsel and the findings and orders were adopted.

6

In April 2011 the social worker filed a request to modify the court's order; she asked that Michael be returned to mother under a plan of family maintenance. The juvenile court later granted the request and ordered Michael into a plan of family maintenance with mother.

### Eighteen-Month Review

The report for the 18-month review recommended that Peter and Matthew be returned to mother under a plan of family maintenance. Mother continued to make progress in her recovery efforts. She participated in recovery services and consistently tested clean. She and Michael were living at Esplanade House. Peter and Matthew were living with her on an extended visit.

Although the Department recognized and commended mother for the tremendous strides she had taken in overcoming her denial about the reasons the children had been removed, the Department remained concerned about mother's ability to maintain appropriate relationship boundaries and be honest with her service providers. The family maintenance recommendation was made with caution and ordered at the hearing on June 30, 2011, along with other recommended findings and orders.

### Family Maintenance Review

The report for the family maintenance review cautiously recommended a continued plan of family maintenance. The Department expressed concern about mother's lack of consistent participation in ordered services, although the Department understood the difficulty mother might be having in raising three children as a single parent. The Department also expressed concern about mother's ability to meet the children's needs. The children needed medical examinations and dental care. They were performing below grade level in school and had issues of absenteeism. Michael continued to exhibit challenging and unpredictable behaviors. Mother had not followed through on a recommendation to have Michael see a child psychiatrist regarding his medication.

7

### Second Detention and Supplemental Petitions

On December 15, 2011, prior to the family maintenance review hearing, the children were detained after mother was arrested for violating her probation based on a positive drug screening and insufficient compliance with the Department's requirements. The probation officer recommended that mother serve a jail sentence of up to 180 days.

On December 19, 2011, the Department filed supplemental petitions requesting a more restrictive placement of all three children. They were placed with the relatives with whom Peter and Matthew previously had resided. At a detention hearing on December 20, 2011, the issue of detention was submitted by counsel. The court ordered the children detained.

### Jurisdiction on Supplemental Petitions

On January 20, 2012, the Department filed a jurisdiction report on the supplemental petitions. The report stated that mother had tested positive for alcohol, which violated her case plan and the rules of her treatment program. She had not admitted to relapsing or struggling with sobriety, and honesty with respect to those issues is vital to the recovery process. At the jurisdiction hearing, mother admitted that the petitions' allegations were true and submitted on the issue of jurisdiction.

### Disposition of Supplemental Petitions

The disposition report recommended that reunification services be bypassed because mother had already received 12 months of services. (§ 361.5, subd. (a)(1)(A).)

The children remained in their placement. They had exhibited some anxiety-ridden behaviors. Peter was very angry at mother for her recent relapse. He had demonstrated some regressive behaviors since being removed from mother's home. Matthew was the most resilient of the children but expressed some confusion about his current circumstances, including mother's relapse and his parents' divorce. Michael had significant mental health needs; the treatment team's goal was to reduce his sedative medications and begin treatment for attention deficit hyperactivity disorder.

8

The children visited mother weekly and looked forward to the visits. During visits the energetic children spent most of their time running, yelling, and chasing each other, sweating profusely, and ultimately appearing physically exhausted. The social worker encouraged mother to balance the visits by devoting a portion of the time to a relaxed activity such as playing a board game or reading a book.

Mother admitted that she had consumed alcohol intermittently during the previous two years. However, she had not consumed alcohol during the period between the completion of her residential treatment program and her most recent relapse. Mother had not disclosed that she was struggling with her sobriety.

After she was released from jail, mother restarted her substance abuse treatment. Her counselor opined that mother should have another chance. A month after restarting services, she submitted "a diluted test."

The report noted that the children were returned to mother at the 18-month review; thus, mother has had more than the maximum allowable time to participate in reunification services. Although mother desired additional time to reunify with the children, the Department recommended that the court set a selection and implementation hearing.

At mother's request, the juvenile court scheduled a contested disposition hearing. Following testimony and argument, the juvenile court followed the Department's recommendation and scheduled a selection and implementation hearing.

### *Request to Change Court Order*

On June 22, 2012, mother filed a request to terminate juvenile court jurisdiction and return the children to her care. Mother alleged that she had remained clean and sober for six-and-a-half months, successfully transitioned from level one to level two of her outpatient care, completed a parent support group and an extensive parenting course, continued to attend a sheriff's work project as well as individual and group therapy, obtained employment, and was seeking her own stable housing.

9

*Adoptability Assessment*

In July 2012 the state Department of Social Services filed an adoptability assessment recommending termination of parental rights and a permanent plan of adoption. The children were five, eight, and 10 years old and had been dependents since January 2010. Although the children had been reunified with mother for approximately six months, they were currently placed with maternal relatives who wished to adopt all three children.

Peter and Matthew were sad that their parents were unable to care for them, but they were happy to be living with their current family. Michael indicated that he wanted to live with his previous foster mother; his desire might have been based in part on the fact that mother also resided with that foster mother. The children relied on their current caretakers for their sense of security and emotional well-being. They appeared to enjoy a warm and healthy attachment to the current family.

The children maintained regular contact and visitation with the birth parents. In June 2012 the visitation began to decrease in preparation for the permanent plan of adoption. The caretakers indicated that, following the adoption, the children and birth parents would have monthly in-person visits and monthly telephone contacts; the children also enjoyed contact with their parents via internet audio or video. The caretakers declined to enter into a postadoption contact agreement due to the birth parents' chronic instability.

The assessment determined that any benefit the children would receive by continuing their legal relationship with mother would be outweighed by the benefit they would receive from legal permanence through adoption.

*Selection and Implementation*

The report for the selection and implementation hearing recommended that parental rights be terminated and the children be placed in a permanent plan of adoption. The children had adjusted well to their relatives' care and were thriving. The foster

mother had been trained to address the children's special needs and their prior exposure to substance abuse.

Soon after the children's previous return to mother's care, mother began decreasing her participation in services. She was not honest with, and did not take advantage of, the support system she had developed. Mother had many previous attempts at staying clean and sober, but those resulted in only short-term success and ultimate inability to achieve long-term sobriety.

A contested selection and implementation hearing was held on September 12, 2012. The selection and implementation report, the adoptability assessment, and the request to change court order were admitted into evidence. Mother testified that she was working as a cook at a "bar and grill." Mother obtained a two-bedroom home with a fenced yard and had a car and insurance. She was participating in outpatient therapy, Narcotics Anonymous meetings, and individual counseling. She had been sober for nine months five days. She had ended her relationship with the former drug dealer and was not then in a relationship. She took a parenting class at a local college. She had also completed probation on the criminal matter that resulted in the second loss of custody.

Following argument on mother's request to terminate juvenile court jurisdiction, the juvenile court found that there had been a change in circumstances but there was not sufficient evidence that terminating jurisdiction would be in the children's best interest.

The social worker testified that mother's visits with the children had been positive and that they have a good, loving relationship. Consistent with the adoptability assessment, the social worker testified that the adoptive parents were willing to have an open adoption but they did not wish to enter into a formal agreement.

The social worker opined that the children's relationship with mother did not outweigh the benefit they would receive from the permanency of adoption. The children "have been through a lot, and now they're happy, stable, all their needs are met." They now had an emotional relationship, but not a parental relationship, with mother. The

11

children looked to their current caretakers for purposes of "being taken care of." The social worker noted that the family the children were with was "willing to maintain an emotional relationship with the parents."

The author of the adoptability assessment testified that she had met with mother and had witnessed some brief interaction between her and the children. She opined that terminating mother's parental rights would not be detrimental to the children because their need for legal permanence superseded their need for visitation with mother. She felt "particularly good" about the adoptive placement because the caregivers had agreed to allow extensive contact with the parents. She opined that contact with the parents benefitted the children's emotional health because it allowed them to "know that mom and dad are doing okay."

The assessment author testified that the caretakers had not noticed the children having any behavioral struggles as a result of the reduction in visitation with the parents. She indicated "it's important to the kids that they know that their parents are doing well."

The previous social worker testified that when mother began having consistent visits, they were positive and it was clear the children enjoyed the visits with both parents.

Following argument, the juvenile court found that there was not sufficient evidence to establish the beneficial parental relationship exception to adoption.

## DISCUSSION

### I.

#### *Beneficial Parental Relationship Exception*

Mother contends the juvenile court's order terminating her parental rights was in error because the children shared a beneficial bond with her and would suffer significant detriment if their relationships with her were severed. She argues the Department improperly relied on the prospect of the parent-child relationships continuing postadoption even though there was no legal requirement for it to occur. We disagree.

## A.

### *Relevant Legal Principles*

" 'At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must make one of four possible alternative permanent plans for a minor child . . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citation.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.)

There are only limited circumstances permitting the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) One of these is where the parent has maintained regular visitation and contact with the child *and* the *child would benefit* from continuing the relationship, often referred to as the beneficial parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i).) The "benefit" to the child must promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*); see *In re C.F.* (2011) 193 Cal.App.4th 549, 555 (*C.F.*).) Even frequent and loving contact is not sufficient to establish this benefit absent a *significant, positive, emotional attachment* between parent and child. (*C.F.*, at p. 555; *Autumn H.*, at p. 575; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418.)

13

No matter how " 'frequent and loving [the] contact' [citation]," and notwithstanding "an emotional bond with the child, . . . the parents must show that they occupy 'a parental role' in the child's life.  [Citation.]"  (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108-1109 (*Andrea R.*); see *In re Jason J.* (2009) 175 Cal.App.4th 922, 938.)

"Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement."  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 (*Jasmine D.*).)

## B.

### *Juvenile Court Ruling*

The juvenile court declined to "find that there is sufficient evidence that the beneficial relationship exception applies.  There has been insufficient evidence that terminating the relationship between the parents and the children would be detrimental to the children.  There has been insufficient evidence that the parents maintained regular visits and contact.  Assuming that there had been sufficient evidence, that their failure to show sufficient evidence that the benefit of maintaining the parent-child relationship would outweigh the benefit of adoption.  These parents have not . . . in two years and eight months been able to effectively get [past] the drug and alcohol addiction and other problems that brought these children before the Court.  They have not been able to meet their children's daily needs as [children's counsel] had pointed out, not able to tuck them in at night, take care of their day-to-day needs, take them to school, help them with homework, feed them, clothe them, care for them.  The parents must show something more than just frequent and loving contact and pleasant visits.  I do not find that the evidence presented has shown that there would be detriment to the children if parental rights were terminated.  The testimony was that contact with the parents encouraged the

14

children's emotional health, and what I understood that testimony to be and what I find is that the children are very concerned about these parents['] well-being because they have seen these parents struggle with domestic violence, struggle with keeping a clean home, struggle to take care of their day-to-day needs. They've seen mom struggle with addiction. They've seen her in her rehab and had to go to a rehab and have seen her get in unhealthy relationships. I assume they've seen the boyfriend's name tattooed on her neck so they're worried about whether their parents are doing well or not. It doesn't mean that -- it doesn't translate into sufficient evidence that terminating the relationship would be detrimental to the children. [¶] So the Court is going to find that there's not sufficient evidence to establish . . . the parental beneficial [relationship] exception [to] terminat[ion of] the parental rights."

## C.

### *Burden and Standard of Review*

The party claiming the exception in the juvenile court has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*C.F.*, *supra*, 193 Cal.App.4th at p. 553.)

As the party must establish the existence of the factual predicate of the exception—that is, evidence of the claimed beneficial parental relationship—and the juvenile court must then *weigh* the evidence and determine whether it constitutes a compelling reason for determining detriment, substantial evidence must support the factual predicate of the exception, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 (*Bailey J.*).)

"On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) " '[E]valuating the

15

factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge.' " (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351.)

## D.

### *Analysis*

Mother had the burden of establishing that she occupied " 'a parental role' " in the children's lives (*Andrea R.*, *supra*, 75 Cal.App.4th at pp. 1108-1109) and that terminating her relationship with the children would be detrimental, such that the children would be greatly harmed (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; *C.F.*, *supra*, 193 Cal.App.4th at p. 553).

The juvenile court did not find a parental role but rather a *role reversal*:  *the children* needed reassurance that *the parents* were doing well, not the other way around. Contact with the parents encouraged the children's emotional health *because it offered the needed reassurance*.  But the parental role includes making sure that this sort of reassurance is not necessary.  Mother largely ignores the court's finding, which finds support in the adoptability assessor's testimony that the children need to "know that their parents are doing well," and mother fails to demonstrate that the finding constitutes an abuse of discretion.

In any event, the social worker testified that the children had an emotional relationship, but not a parental relationship, with mother.  This is because the children look to their current families for purposes of being taken care of.  The social worker's testimony supports the juvenile court's ruling to the extent that it failed to find that mother played a parental role in the children's lives.[3]

---

[3] Mother claims there was testimony from the social workers that she and the children shared a "very parental relationship."  This misstates the record.  As noted, the current

16

Even if mother occupied a parental role, the adoptability assessor made plain that its termination would not cause the children to be greatly harmed. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; *C.F.*, *supra*, 193 Cal.App.4th at p. 553.) The assessor testified that the children would not suffer if they were to have less time and contact with mother. She explained that when contact was reduced in preparation for the selection and implementation hearing, the reduction "has made them sad, but they understand that mom isn't able to have them in her home and that she's not stable enough to have them." The written assessment elaborated that "Peter and Matthew are understandably sad that their parents are unable to have them in their care, but are happy with living with family that loves them." Michael evidently wanted to live with mother, but his inability to do so resulted in no evident harm. Instead, the children relied on their caretakers for their sense of security and emotional well-being. There was sufficient evidence that, although it might produce some sadness, termination of parental rights would not cause any of the children to be greatly harmed.

The present case is not like *In re Amber M.* (2002) 103 Cal.App.4th 681, on which mother relies. In *Amber M.*, evidence from a CASA, a psychologist, and therapists showed a beneficial parental relationship that outweighed the benefit of adoption. The social worker was "the only dissenting voice among the experts," and she "provided no more than a perfunctory evaluation of [the] Mother's relationship to the children." (*Id.* at p. 690.) Here, in contrast, the experts essentially were in agreement and no expert suggested that termination of mother's relationship with the children would cause any child to be greatly harmed.

Mother counters that the social worker and the adoptability assessor mistakenly minimized the harm that the children would suffer if parental rights were terminated by

social worker testified that they did *not* have a parental relationship. The former social worker stated only that the children show mother "the respect [accorded to] a parent."

17

improperly factoring in the willingness of the adoptive parents to allow continuing contact with the natural parents. Not so.

When considering the beneficial relationship exception to adoption, the juvenile court cannot minimize the harm expected to flow from termination by theorizing that the adoptive parents voluntarily will maintain the child's relationship with the birth parents. (*In re C.B.* (2010) 190 Cal.App.4th 102, 127-128 (*C.B.*); *In re S.B.* (2008) 164 Cal.App.4th 289, 300 (*S.B.*).)

The juvenile court's ruling contains no reference to, or reliance upon, the adoptive parents' willingness to allow future contact. (See part I.B., *ante*.) Mother concedes that no such reference was made. Thus, the court did not err under *C.B.*, *supra*, 190 Cal.App.4th 102 and *S.B.*, *supra*, 164 Cal.App.4th 289.

Mother claims instead that the juvenile court could not "reasonably rel[y] upon" the testimony of the adoptability assessor and the social worker, because they had "included this improper injection into their opinions." But nothing in the record suggests this "improper injection" infected the workers' opinions as a whole, such that the entirety of their testimony should have been disregarded. Nor is there any indication the juvenile court was incapable of separating the disputed remarks from the balance of the testimony. Mother has not presented error affirmatively by an adequate record. (*Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1532.)

In sum, the juvenile court's refusal to employ the beneficial parental relationship exception to adoption was supported by substantial evidence and was not an abuse of discretion. (*Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.)

## II.

Mother contends the juvenile court's order denying her request to terminate juvenile court jurisdiction and return the children to her care was not supported by evidence and thus was an abuse of discretion. We disagree.

18

## A.

### *Relevant Legal Principles*

A parent may bring a petition for modification of any order of the juvenile court pursuant to section 388 based on new evidence or a showing of changed circumstances. "The parent requesting the change of order has the burden of establishing that the change is justified. [Citation.] The standard of proof is a preponderance of the evidence. [Citation.]" (*In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703.)

Determination of a petition to modify is committed to the sound discretion of the juvenile court, and absent a showing of a clear abuse of discretion, the decision of the juvenile court must be upheld. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319 (*Stephanie M.*); *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.) The best interests of the child are of paramount consideration when the petition is brought after termination of reunification services. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) In assessing the best interests of the child, the juvenile court looks not to the parent's interests in reunification but to the needs of the child for permanence and stability. (*Ibid.; In re Marilyn H.* (1993) 5 Cal.4th 295, 309 (*Marilyn H.*).)

## B.

### *Juvenile Court Ruling*

The juvenile court ruled: "The Court finds that there has been sufficient evidence that there has been a change in circumstances. Mom has nine months, five days clean and sober. She's gainfully employed. She has her own housing. She's completed probation. She's participated in counseling with Catalyst and Stepping Stone. She's an active participant in AA and NA. She's working on a workbook with her sponsor. She is not in any relationship. Unfortunately, mother has not shown sufficient evidence that would be in the best interest of the children that a Court can dismiss this case and place the children in her care. I wish that mom had made those changes two years ago instead of now. There's no guarantee that she won't relapse if the children were placed in her

19

care. She's attended approximately seven rehabilitation programs with limited success since 2006. She's had the children back and she continued to use alcohol when she was trying to reunify. She was participating in a very unhealthy relationship with a person who was known to deal drugs. And the Court is not willing to take a leap of faith and place the children in a situation that might be detrimental to them. [¶] So the Court is going to find that there has been insufficient evidence that it would be in the best interest of the children. Mother said that the best interest for her sons, she can give them only love that a mother can give them. Unfortunately, even though you love them, you weren't giving them the care that they needed. And that means you don't expose them to domestic violence. You don't have a filthy home. You don't neglect their needs. You don't continue to use, and you don't participate in other unhealthy relationships. It's more than just loving them. It's providing for their care day in and day out, which I'm not convinced you can do yet. I think you're on your way. You're a work in progress. I'm very pleased and proud of the progress you've made. You spoke well for yourself. You're an advocate for yourself. I don't want this to set you back. I want this for you to go further. I'm very proud of the way things are going for you now with your past history, and I hope that continues."

## C.

### *Analysis*

Mother claims the juvenile court should have focused on "the level of change [she] had made," not whether the changes would fail to endure as suggested by the relapse and the second removal. But whether the changes would endure was central to the best interests analysis, in which the juvenile court looks not to the parent's interests in reunification but to *the children's needs for permanence and stability*. (*Stephanie M.*, *supra*, 7 Cal.4th at p.317; *Marilyn H.*, *supra*, 5 Cal.4th at p. 309.) As illustrated by the second removal, the failure of mother's changes to endure could require another removal and ensuing instability in the children's lives. The court properly focused on mother's

20

limited success in rehabilitation as it relates to the children's need for permanence and stability.

The September 2012 hearing on mother's request to change court order followed the second detention in December 2011 by just nine months. Mother's successes in rehabilitation occurred after the second detention and thus were less than nine months old at the time of the hearing. Under these circumstances, the juvenile court had no duty to conclude that mother's changes were durable or that returning the children to her care and dismissing the dependency met the children's need for permanence and stability. There was no error or abuse of discretion.

## DISPOSITION

As to each child, the orders denying Mother's request to change a court order and terminating her parental rights are affirmed.

                                    RAYE            , P. J.

We concur:

        ROBIE        , J.

        MURRAY      , J.